IRA CARLEY AND EDWARD L. PARMENTER v. ROLAND
C. GITCHELL ET AL.

*Public lands—Contract to convey homestead—Claim—Validity—
License—Equity jurisdiction.*

1. A contract made in anticipation of the entry by the contractor
   of land under the United States homestead law, by which
   he agrees to sell to the contractee a portion of the land, and,
   upon acquiring the government title thereto, to convey said
   portion to the contractee, who in the meantime is to have
   the use of the same, is against public policy, and will not be
   enforced in a court of equity; citing *Anderson v. Carkins,* 135
   U. S. 483:

2. Occupancy by the contractee of the contracted land for a
   period of time less than that required to create a right by
   prescription, and the making, with the knowledge of the con-
   tractor, of improvements thereon contemplated by the con-
   tract, will not create a license to use the land, irrevocable
   so long as the improvements are maintained.

3. A proposed homesteader of government land contracted to sell,
   and convey when he should acquire the government title,
   to the owner of a mill site separated from the land by a river,
   which the contractee desired to dam, a strip of land upon
   which one end of the dam might rest, and such other portions
   of said land as might be flooded by reason of the erection
   and maintenance of the dam. The contractee, who under
   the contract was entitled to the immediate possession of the
   contracted land, in company with his grantee, to whom he
   had conveyed one-half of the mill site, constructed the dam,
   and erected a sawmill on the mill site, which they thereafter
   operated for 10 years, during which time they used said strip
   of land for the storage of lumber, and erected buildings
   thereon for use in connection with their business, and flooded
   about eight acres of the land. The contractor entered the
   land as a homestead, and after his death it was patented to
   his widow, who sold and conveyed the entire land to third
   parties, and they brought ejectment against the contractee
   and his grantee, who thereupon filed a bill to enforce the
   specific performance of the contract and restrain the prose-
   cution of the ejectment suit. And it is held that, the complain-

ants not having obtained a title to the land such as is enforceable either at law or in equity, and having acquired no right by prescription, and having placed themselves in the position in which they are while acting under a contract void on the ground of public policy, it is impossible to relieve them without ignoring the rights of property, and assuming to make contracts for parties, or to punish one party to an illegal contract and thereby advance the interests of the other, which cannot be done any more on the equity side of the court than in a suit at law.

Appeal from Menominee. (Stone, J.) Argued October 11, 1894, and reargued by order of the Court February 14, 1895. Decided April 16, 1895.

Bill for specific performance of a land contract, or, if the contract cannot be enforced, then for a decree awarding the possession of the land to complainants for a term of years sufficient to fulfill the purposes of the contract. Complainants appeal. Decree affirmed. The facts are stated in the opinions.

*Sawyer & Waite,* for complainants.

*W. H. Phillips* (*B. J. Brown,* of counsel), for defendants.

MONTGOMERY, J. The conceded facts in this case are as follows: Complainant Parmenter, on April 3, 1883, purchased land for a sawmill site on Cedar river, in the S. W. corner of the S. W. $\frac{1}{4}$ of section 35, township 35 N., range 27 W., in Menominee county. At this point the Cedar river runs nearly on the line between sections 34 and 35. On May 26, 1883, one Samuel McIntosh and Parmenter made a written contract, by which McIntosh agreed to sell to Parmenter a strip of land in the S. E. corner of the S. E. $\frac{1}{4}$ of section 34, 968 feet long and 132 feet wide, and also such other portions of the S. E. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ as might be flooded or overflowed by reason of the building and maintaining of a dam by said Parmenter across said river when said river was at its usual height, for the sum of $3 per acre for all of said

land so described. Said McIntosh agreed to convey the title by proper deed to Parmenter, after he had acquired a good, sure, and indefeasible title from the United States to said 40 acres of land, at which time the consideration was to be paid. Parmenter was to have possession of the strip. This agreement was duly recorded May 31, 1883. Soon thereafter Parmenter conveyed a half interest in this mill site to complainant Carley. The complainants immediately erected a mill upon their land upon the east bank of the stream, and constructed a dam, one end of which rested upon the land described in the above agreement. They also took possession of said strip, and have used it for storing lumber, and have erected some buildings thereon. The erection of the dam caused about eight acres to be flooded all the time, which, without the dam, would be flooded only in the spring and at the time of heavy rainfalls. The cost of their entire mill plant is $22,000. They occupied said mill property from 1883 to October, 1892, when this bill was filed. McIntosh made a formal entry of this land, 80 acres (S. $\frac{1}{2}$ of S. E. $\frac{1}{4}$), under the homestead act of Congress, on the 25th day of June, 1883. He lived upon and occupied it, clearing and improving certain portions thereof, until March 13, 1888, when he died. His title would have become complete in June following. His widow made application under the homestead act, thereby succeeding to the rights of her husband, and obtained a patent September 1, 1891. December 24 following she conveyed the land by deed to the defendants. Prior to the entry of McIntosh, one Kenny had made entry of this 80 acres, and had made certain improvements thereon. For reasons unnecessary to mention, his entry and application were void. McIntosh was poor, and at the time he made the agreement Parmenter paid Kenny for his improvements, for McIntosh, who desired to make a homestead entry upon the land, and also the expenses of McIntosh in making the entry. The land was at that time of little value, not exceeding $3

per acre. Owing to the erection of the mill its value was increased to $12 per acre. After the purchase by the defendants, they brought an action of ejectment against complainants, who thereupon filed this bill in chancery, setting up the above facts, alleging the irreparable injury to them by the substantial destruction of their property, and praying for the specific performance of the contract, that they be decreed to be in the rightful possession of the property for the purposes of flowage, and that, if the contract cannot be enforced, they may be decreed to have possession for a term of years sufficient to fulfill the object of the mill plant and improvements. The case was heard upon pleadings and proofs, and the bill dismissed.

The circuit judge found this agreement between McIntosh and Parmenter to be against public policy, and void under the homestead act. It will be noticed that the contract in question was made prior to the actual entry of the land as a homestead by McIntosh at the United States land office, so that he was required to make both the preliminary affidavit under section 2290 of the Revised Statutes, and final proof of occupancy under section 2291. Section 2290 requires that the applicant shall make an affidavit, in which he shall state that such application is made for his exclusive use and benefit, and that his entry is made for the purpose of actual settlement and cultivation, and not, either directly or indirectly, for the use or benefit of any other person. Section 2291 requires that, in addition to proof of residence and cultivation, the applicant shall make affidavit that no part of such land has been alienated, except as provided by section 2288, which section authorizes a conveyance for church, cemetery, or school purposes, or for the right of way of railroads.

We think it is impossible to distinguish the present case from *Anderson v. Carkins*, 135 U. S. 483. In that case Anderson agreed with Carkins, by an agreement bearing date December 16, 1876, to convey to him by

good and sufficient warranty deed, on or before May 1, 1881, the land described. The land was entered as a homestead on the 7th of March, 1877. On the 31st of March, 1884, Anderson made final proof under the homestead law. The land contracted to be conveyed by Anderson had been in the possession of Carkins, who held it, together with 80 acres additional, as a timber claim, from 1873 to the time of the contract. He had broken and cultivated 40 acres, and planted on it 20 acres of trees. The improvements that he had made were of the value of $1,000, and it was in consideration of his relinquishing his claim to the 60 acres that the agreement to convey the land in question, one-half of the amount, was made. A similar consideration was furnished in the present case by Parmenter, he paying Kenny for the improvements which he had made upon the land prior to the entry of McIntosh. The Court, in *Anderson v. Carkins*, had no difficulty in holding that there was ample consideration for the contract, but it was held void on grounds of public policy. The Court said:

"There can be no question that this contract contemplated perjury on the part of Anderson, and was designed to thwart the policy of the government in the homestead laws, to secure for the benefit of the homesteader the exclusive benefit of his homestead right. Such a contract is against public policy, and will not be enforced in a court of equity."

See, also, *Mellison v. Allen*, 30 Kan. 382.

But it is strenuously insisted that,—

"As McIntosh permitted the complainants to have possession of this land, and the use of the stream, with the right to attach their dam to his side of the stream, with knowledge that they were to build a mill, and as a matter of fact was knowing to the steps entered into by them to build and equip the mill at the large expense which they were to," his acts should be construed as "at least a license, which in time might ripen into an easement, even if it had not after this lapse of time;

and being a license acted upon, and upon which money was expended, it would be irrevocable so long as the mill of complainants was carried on and operated at that point."

The occupancy has not been for a sufficient length of time to create a right by prescription, and it is but an evasion to say that that which could not be made the subject of agreement, because of public policy intervening to prevent it, can be sustained as a license, where the only attempt at license is in the execution of an agreement void in law. To sustain this contention would be in effect to make a new contract for the parties, and we think it not permissible.

An attempt is made to bring this case within the case of *Edwards v. Mining Co.*, 38 Mich. 46. In that case a bill was filed for an injunction. Defendant, at a cost of some $60,000, had erected a stamp mill on the banks of Hill creek, and had been operating the same for some years. As a result of its operation, large quantities of sand were carried down by the waters of the stream, and deposited on the bottom lands below, and the evidence showed that it would be impossible to carry on the mining operations of defendant with profit unless this were permitted. After the erection of the mill, the complainant purchased a piece of land, through which the water ran, a short distance below this mill, and upon which the mill, as operated, was depositing sand. This land was purchased for speculative purposes, and apparently under an expectation of being able to force defendant to buy it at a large advance on the purchase price. The real value of the land, except as a convenience to the business of defendant, was small. The Court held, in effect, that an injunction is not a process to be lightly ordered in any case, and is not a matter of right, and it was said:

"Wherever one keeps within the limits of lawful action, he is certainly entitled to the protection of the law, whether his motives are commendable or not; but,

if he demands more than the strict rules of law can give him, his motives may become important. In general, it must be assumed that the rules of the common law will give adequate redress for any injury; and when the litigant avers that under the circumstances of his particular case they do not, and that, therefore, the gracious ear of equity should incline to hear his complaint, it may not be amiss to inquire how he came to be placed in such circumstances."

It was further said in the case that—

"It is beyond question that complainant sustains a legal injury, for which he is entitled to suitable redress. The only question on this record is whether he is entitled to the special redress he seeks, namely, an injunction."

And in conclusion it was said:

"If complainant wants more than is reasonable, he has a right to obtain it under the rules of law, but he cannot demand the aid of equity in a speculation. If, in speculative language, he has a corner in real estate, there is no greater reason why he should have the assistance of an injunction to aid his schemes than there would be if on the produce exchange he had effected a corner in grain. Without the writ, in either case he may be the sufferer, but he suffers nothing for which damages cannot compensate him."

We have quoted from the opinion of Mr. Justice COOLEY. In this case Chief Justice CAMPBELL dissented, and Mr. Justice MARSTON did not sit; Mr. Justice GRAVES concurring in the result reached by Mr. Justice COOLEY. But this case is an authority rather for the defendants than for the complainants. The effect of the decision was to remand the complainant to his suit at law, and this was put upon the ground that a court of equity is not bound to interfere by an injunction when an adequate remedy at law exists. Indeed, it was stated in distinct language:

"He is entitled to his rights under the rules of law, but he is entitled to nothing of grace."

In the present case this is precisely what the defend-

ants are asking by their action of ejectment. If they were before the court, asking an injunction, and the opinion of Mr. Justice COOLEY in *Edwards v. Mining Co.* should be followed, an injunction would be denied them on the ground that they are entitled to their rights under the rules of law, but that they are not entitled to anything of grace, and they would be remanded to their remedy by an action at law. What a mockery this would be, if, after they were thus remanded to a court of law, and were prosecuting their suit, it would be open to the defendants in that litigation to turn about and file a bill to prevent them from pursuing the very remedy to which the court had remanded them.

This may be a hard case for the complainants, but, they not having obtained a title to the land such as is enforceable either in equity or in law, and having acquired no right by prescription, and having placed themselves in the position in which they are, acting under a contract void on the ground of public policy, we find it impossible to relieve them, unless we shall ignore rights of property, and assume to make contracts for parties, or punish one party to an illegal contract and thereby advance the interests of the other. This we cannot do any more on the equity side of the court than in a suit at law.

The decree of the court below will be affirmed, with costs.

McGRATH, C. J., LONG and HOOKER, JJ., concurred with MONTGOMERY, J.

GRANT, J. (*dissenting*). It is contended that the agreement between McIntosh and Parmenter is against public policy and void, because, under the terms of the homestead act, neither McIntosh, had he lived, nor Mrs. McIntosh, could have completed the evidence required to obtain a certificate and patent without committing perjury. In making such proof the applicant is

required to make "affidavit that no part of such land has been alienated." It is argued that this agreement was an alienation within the meaning of the law. The case of *Anderson v. Carkins*, 135 U. S. 483, is relied upon to support this contention. The decision of that Court in such cases is binding upon the state courts, and must be followed. Our only inquiry, therefore, is directed to the question whether that case governs this. The facts are wholly dissimilar. In that case the consideration was paid. The agreement recited that Anderson, the homesteader, had sold the land to Carkins, and had agreed to give a deed at a specified time, which was before the expiration of the five years. At the time the contract was made,—December 16, 1876,—Carkins had been in possession of the entire quarter section, which he had held as a timber claim, from 1873. The contract was made in contemplation of Anderson's taking the land as a homestead. Carkins had made improvements to the value of $1,000, and relinquished his possession to Anderson, who was to enter into possession to acquire the title under the homestead act, and convey one-half the land to Carkins in payment for the improvements. March 7, 1877, Anderson entered the land as a homestead. Under these facts it is too clear to require argument that the scheme was in direct violation of the homestead act, and that there was no *bona fide* intention on the part of Anderson to make the land a homestead. Obviously he could not make the requisite proof without committing perjury. Equity will not interfere in such a case. In the present case there is nothing to indicate bad faith on the part of McIntosh in making his homestead entry, nor on the part of Parmenter in entering into the contract. The location and erection of the mill greatly enhanced the value of the entire land entered by McIntosh. A homesteader may convey the land the next day after his entry and occupation have ripened into a title. There is much force in the argument that a man may contract lawfully, before he has

obtained title, to do that which he has a clear right to do after he has obtained it; and it may not be entirely free from doubt that the federal courts would not so hold. But the language of the Court in *Anderson v. Carkins* is very broad. Besides, it cites and quotes with approval *Mellison v. Allen*, 30 Kan. 382, which was also written by the same justice, who was then a justice of the supreme court of Kansas. Referring to that case, we find the issue stated as follows:

"It will be perceived that the single question is whether the contract to convey, made prior to the ripening of his homestead right and the proving up of his homestead claim, was a legal and valid contract, and one whose specific performance equity will enforce."

It does not appear in this case whether the deed of conveyance was to be made before or after the perfection of the title in the homesteader. This language, however, covers the contract in the present case; and, notwithstanding the good faith of the parties to it, and the strong equity in behalf of the complainants, we do not feel at liberty to hold to the contrary. In this respect, therefore, the decree of the court below must be sustained.

I think, however, that the complainants are entitled to relief to prevent the destruction of the dam, one end of which rests upon the defendants' land. The dam and mill plant were erected with the express assent of McIntosh, and with the knowledge and acquiescence of his wife. Both were greatly benefited thereby. The defendants purchased with full knowledge of these facts and of the situation. They possess no rights, legal or equitable, other than those possessed by Mr. and Mrs. McIntosh. A trifling amount would, in any event, compensate them for all the damages sustained, while the destruction of the dam would work irreparable injury to the complainants, causing a loss of many thousands of dollars. The land overflowed is comparatively worthless, and is overflowed in its natural state some portions

of the year. We think this branch of the case is clearly within the rule enunciated by this Court in *Edwards v. Mining Co.*, 38 Mich. 46. In that case the land, useful for only the same purposes as this, was covered with stamp sand from the defendant's stamp mill, which practically destroyed its value. In the present case it is covered with water. The forcible language of Mr. Justice COOLEY in that case is equally applicable here, and we refer to it without quoting it. While the purpose of the defendants in making the purchase is not as clearly shown upon the record as was that of Mr. Edwards, still we cannot shut our eyes to the situation, nor to the conclusion that their purpose was the same. The defendants can be amply compensated in a suit at law for the small damage, if any, sustained, and to this remedy the court of equity will leave them.

It is, however, urged that complainants are not the owners of the land seeking relief, as was Edwards, and that courts of equity will not restrain a land-owner from prosecuting a suit to enforce his strict legal rights. Relief in equity is not circumscribed by such a narrow and technical rule. Its province is to relieve from the enforcement of strict legal rights and remedies, where equity and good conscience require it. To hold otherwise would be to abandon the substance for the shadow. The principle established in the Edwards case should govern in the present one, and this cannot be determined by the answer to the question, who is the moving party? Had the Allouez Mining Company sought relief from some legal action on the part of Edwards, which would have prevented the flowing of the sand over his land, and destroyed the stamp-mill plant, would the court have replied to it, "You can have no relief from this action, notwithstanding it results in the destruction of your property, causing you great and irreparable injury, although Edwards will suffer only nominal damages?" If the Allouez Mining Company had erected a dam across the stream for the storage of water

with which to run its mill, as was often done in that region, and, by the express assent of Edwards or his grantor, had placed one end of its dam against and upon the bank of his land, and had Edwards brought an action of ejectment to oust it, or threatened to remove the dam upon his land, he would have been seeking the enforcement of his strict legal rights. If the company had then appealed to the chancery court to restrain such suit or threatened action, would the court have held that Edwards was pursuing his strict legal right, and the court was therefore powerless to grant relief? If, in the present case, the entire dam were on the complainants' land, the defendants, under the principle established in the Edwards case, could not obtain its removal, but would be left to their remedy in a suit for damages for overflowing their land. Can the rule be different simply because one end of the dam rests upon the defendants' land? It is difficult to imagine a stronger case for the interposition of a court of equity, whose peculiar jurisdiction is to grant relief from the enforcement of a strict legal right, where justice and good conscience require it, and where irreparable injury will result to the one party, while the other can be amply compensated in a suit for damages. The language quoted in the opinion of my Brother MONTGOMERY from the decision in the Edwards case must be read and interpreted in the light of the fact that in that case the sole remedy of Mr. Edwards was by suit to recover damages for the virtual destruction of his property.

Complainants seek to have the decree of the court below modified so as to restrain the defendants from interfering with the dam as it existed at the time of their purchase, until they shall have time to cut and manufacture the timber for which their plant was constructed. I think the decree should be so modified, and the case remanded to the court below, with the instruction to permit the parties to produce further testimony

105 MICH.—4.

if desired, and to determine the time which the complainants shall have for that purpose. I think no costs should be allowed.